## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

KYLE BOSARGE,             :
                             :
      Plaintiff,         :
                             :
vs.                     :     CIVIL ACTION NO. 1:18-cv-240-TFM-N
                             :
MOBILE AREA WATER & SEWER     :
SERVICE, *et al.*,         :
                             :
      Defendants.     :

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' *Motion for Summary Judgment and Supporting Brief.* Doc. 89, filed July 15, 2020.[1]  Also, pending before the Court are two (2) motions to strike that are related to the instant motion for summary judgment: Defendants' *Motion to Strike Affidavit of Kyle Bosarge* (Doc. 106, filed September 10, 2019) and Plaintiff's *Motion to Strike Deposition Testimony of Dr. Terry Millette* (Doc. 108, filed September 13, 2019).  Having considered the motions and relevant law, the Court finds the motion for summary judgment (Doc. 89) is due to be **GRANTED**, Defendants' motion to strike (Doc. 106) is due to be **SUSTAINED in part and OVERRULED in part**, and Plaintiff's motion to strike (Doc. 108) is due to be **OVERRULED**.

---

[1] For the purposes of judicial economy and consolidation of motions, Defendants Sharon King's and Fatima Washington's Motion to Dismiss First Amended Complaint was converted to a motion for summary judgment and consolidated with Defendants' later-filed Motion for Summary Judgment and Supporting Brief.  Docs. 35, 99.  The Court considers the later-filed motion for summary judgment as the operative motion and the previously-filed motion as amended and subsumed into the later-filed motion.  *Id.*

## I.      PARTIES AND JURISDICTION

For the purposes of this memorandum opinion and order, the Court will refer to Plaintiff Kyle Bosarge as "Plaintiff;" Defendant Board of Water and Sewer Commissioners of the City of Mobile as "the Board;"[2] Defendant Sharon King as "King;" Defendant Fatima Washington as "Washington;" and Defendants the Board, King, and Washington collectively as "Defendants."

The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1343(a)(4); and 42 U.S.C. § 1983.

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.

## II.      PROCEDURAL AND FACTUAL BACKGROUND

### A.      Procedural Background

Plaintiff exhausted his administrative remedies when he timely filed his charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), which issued Plaintiff a Notice of Right to Sue.  Doc. 1 at 3.

Plaintiff originally filed his Complaint with this Court on May 24, 2018, in which he brought claims of interference in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12101-213, and § 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 701-796l (Count 1); retaliation in violation of the ADA and § 504 of the Rehabilitation Act (Count 2); a retaliatory hostile work environment in violation of the ADA and § 504 of the Rehabilitation Act (Count 3); failure to promote in violation of the ADA and § 504 of the Rehabilitation Act (Count 4); constructive demotion and/or forced reassignment in violation

---

[2] The Board states it is misidentified by Plaintiff as the "Mobile Area Water and Sewer Service." Doc. 89 at 1.  As stated, the Court will refer to the defendant that Plaintiff identifies as the "Mobile Area Water and Sewer Service" as "the Board."

of the ADA and § 504 of the Rehabilitation Act (Count 5); unauthorized medical inquiry in violation of the ADA (Count 6); violation of 42 U.S.C. § 1983 and the First Amendment (Count 7); failure to supervise and train in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment (Count 8); negligent supervision and training (Count 9); and invasion of privacy (Count 10). Doc. 1. Plaintiff brings his claims against the Board; King, individually and in her official capacity as the Human Resources Director for the Mobile Area Water and Sewer Services ("MAWSS"); and Washington, individually and in her official capacity as Human Resources Officer for MAWSS. *Id.*

The Board filed its Answer and King and Washington filed their Motion to Dismiss on June 20, 2018. Docs. 10, 11. King and Washington argued in their Motion to Dismiss Plaintiff failed to plead facts that, if true, would either form the basis of a violation of Plaintiff's First and Fourteenth Amendment rights or a violation of state law, and King and Washington were entitled to qualified immunity. Doc. 11 at 1. On July 23, 2018, Plaintiff filed his Motion for Leave of Court to Amend Complaint, which the Court granted and ordered Plaintiff to file his amended complaint by September 24, 2018. Docs. 17, 32. Plaintiff filed his First Amended Complaint and Jury Demand on September 20, 2018, in which he brings the same claims against the same defendants as he did in his original Complaint, except he identifies Washington as the Assistant Human Resources Director for MAWSS. *Compare* Doc. 1 *with* Doc. 33. The original Motion to Dismiss was, therefore, rendered moot by the First Amended Complaint.

King and Washington filed their Motion to Dismiss First Amended Complaint on October 4, 2018, in which they again argued Plaintiff failed to plead facts, which if true, would either form the basis of a violation of Plaintiff's First and Fourteenth Amendment rights or a violation of state law, and King and Washington were entitled to qualified immunity. Doc. 35. On the same day,

the Board filed its Answer to Plaintiff's First Amended Complaint.  Doc. 36.  Plaintiff filed his response to the Motion to Dismiss First Amended Complaint on October 17, 2018, and King and Washington filed their reply on October 25, 2018.  Docs. 38, 41.

On July 15, 2019, Defendants filed their Motion for Summary Judgment and Supporting Brief, to which Plaintiff timely filed his response and Defendants their reply.  Docs. 89, 97, 107; *see also* Docs. 93, 94, 95, 100, 101.  On August 16, 2019, the Court converted King's and Washington's Motion to Dismiss First Amended Complaint to a motion for summary judgment and the Court stated it would jointly consider the two (2) motions under a summary judgment standard pursuant to Fed. R. Civ. P. 56.  Doc. 99.

On September 10, 2019 Defendants filed their Motion to Strike Affidavit of Kyle Bosarge, to which Plaintiff filed his response, and on September 13, 2019, Plaintiff filed his Motion to Strike Deposition Testimony of Dr. Terry Millette, to which Defendants filed their response.  Docs. 106, 108, 109, 111.

**B.**     **Factual Background**

At all relevant times to this matter, King and Washington were MAWSS Human Resources ("HR") Officers whose duties were to write and interpret policies; handle disciplinary actions, complaints, benefits, and training; supervise the training manager; and ensure staff is informed of MAWSS's EEOC and ADA policies and procedures.  Docs. 97-56 at 5, 97-58 at 6-9.

Charles Sumrall was a Garage Supervisor and Plaintiff's direct supervisor.  Doc. 33 ¶ 17; Doc. 97-57 at 3.  Adam Lynn was a Vehicular Equipment Mechanic Supervisor and also served as Plaintiff's direct supervisor for six (6) months.  Doc. 97-59 at 3.

Plaintiff was hired by the Board as an Auto Service Worker I in June 2013 and was promoted to Auto Service Worker II in July 2014.  Doc 97-7 at 2-3.  Plaintiff received satisfactory

job performance ratings for his annual service ratings in June 2014, August 2015, and August 2016 and received an unsatisfactory job performance rating for his annual service rating in October 2017. Doc. 97-9 at 2-5.

In September 2015, Plaintiff submitted to MAWSS a Family and Medical Leave Act ("FMLA") leave request form for his employer to make the proper accommodations for his disability, Multiple Sclerosis ("MS"). Docs. 97-20 at 2, 97-30 at 2-3. In October 2015, Dr. Terry Millette, Plaintiff's treating physician, submitted to MAWSS a "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" ("the FMLA medical form"). Doc. 97-21. The FMLA medical form had deficiencies, so Plaintiff submitted updated forms in July 2016 and on August 12, 2016. Docs. 97-22 at 2-10, 97-27 at 2-5, 97-30 at 2-3. In Plaintiff's FMLA medical form that was completed on June 17, 2016, Dr. Millette noted Plaintiff's MS commenced in 2009; it is a permanent condition; Plaintiff was prescribed medication to treat his MS; Plaintiff was unable to perform some of his job functions due to his heat intolerance; Plaintiff could experience loss of vision, fatigue, and extremity weakness with spasticity; Plaintiff would be incapacitated for a single continuous period of time due to his MS for an unknown period of time; Plaintiff's MS would cause episodic flare-ups that would periodically prevent him from performing his job functions; it would be medically necessary for Plaintiff to be absent from work for an unknown amount of time during his MS flare-ups; Plaintiff's flare-ups were estimated, over a six (6) month period, to occur every three (3) to six (6) weeks and would last between three (3) to five (5) days per episode. Doc. 97-27 at 2-5.

However, in a letter from Dr. Millette that is dated October 20, 2016, he stated in regard to Plaintiff: "This patient is followed in this office for a neurological condition from which he is currently doing well. He has no neurological deficits and has no restrictions from his job duties

or driving.  This letter was written for clarification purposes.  All considerations will be greatly appreciated."  Doc. 97-28.

To accommodate Plaintiff's assessed heat intolerance, MAWSS allowed Plaintiff to use a fan when he worked in the garage and allowed him to take breaks as needed.  Docs. 97-30 at 2-3, 97-53 at 2.  In June 2016, Plaintiff did not require FMLA medical leave, and in May 2016, he required eight (8) hours of medical leave.  Docs. 97-24 at 5, 97-53 at 2.  On August 9, 2016, Plaintiff's supervisor notified Plaintiff he was no longer permitted to drive or operate any of MAWSS's vehicles or drivable equipment.  Docs. 97-30 at 2-3, 97-57 at 71.  In a letter that is dated August 19, 2016, MAWSS notified Plaintiff it would continue the additional accommodation that required him not to drive to "protect [his] safety and decrease MAWSS's liability of an accident occurring."  Doc. 97-30 at 2.  As a result of Plaintiff's driving and operating restrictions, he was prohibited from being on the standby list.  Docs. 97-45, 97-58 at 63-64.  MAWSS did not clarify with Dr. Millette whether Plaintiff could operate a vehicle.  Doc. 97-56 at 114.

On May 20, 2016, a Vehicular/Equipment Mechanic (Medium/Heavy Truck) position with MAWSS ("the mechanic position") was opened to applicants by the Mobile County Personnel Board ("the Personnel Board").  Doc. 97-10 at 2-11.  The mechanic position description was as follows:

> Analyzes problems with vehicles and equipment to determine repairs needed; overhauls engines; cleans parts to check for wear and damage; repairs hydraulic systems; inspects, adjusts and replaces valves, pistons, main bearing assemblies, ignition, lubrication, cooling, fuel and exhaust systems, adjusts connecting rods and mainbearings; repairs or overhauls brake systems, transmissions, differentials, final drives and front and rear axles; inspects and repairs electrical equipment, generators, alternators, distributors, magnetos and starter motors; revamps ignition and lighting systems; operates shop testing equipment; repairs motorcycles, small engines, service engines, tractors and attached implements, draglines, motor patrols, bulldozers, gradeall machines and other equipment; repairs and maintains police and fire vehicles and equipment; test drives vehicles to insure proper operation; does body work, welding and incidental painting; replaces glass;

operates tow truck when necessary; repairs equipment in the field as necessary; repairs hydraulic systems; cleans work area; performs related work as required.

*Id.* at 5.

The mechanic position was open to "[a]ll regular employees of [MAWSS] . . . who have not received an unsatisfactory service rating in the two previous years." *Id.* The mechanic position's minimum and special requirements included:

**MINIMUM REQUIREMENTS:** Graduation from a standard senior high school, or the successful completion of the General Educational Development (GED) test, and completion of an apprenticeship or trade school program in automotive or diesel repair, and a minimum of one year's journeyman level experience in maintenance and repair in one of the following areas: (1) automotive/light truck/miscellaneous; (2) medium/heavy truck; or (3) construction equipment; or a combination of education and experience equivalent to these requirements.

**SPECIAL REQUIREMENTS:** Must possess a commercial driver's license or a valid driver's license from state of residence. Must obtain a commercial driver's license with appropriate endorsements, including air brake endorsement prior to completion of the six month working test period.

Good knowledge of gasoline and diesel engines, chassis, electrical wiring, hydraulic systems, welding and body work; good knowledge of the standard practices and tools of the vehicular mechanics trade; good knowledge of the operating principles of gasoline and diesel engines; good knowledge of repair methods used on a variety of light and heavy equipment; ability to diagnose and locate defects in vehicular equipment; ability to repair automotive, light truck, small engine and miscellaneous equipment, medium to heavy trucks (double and triple tandem – Class 3 – 8) or construction equipment; ability to keep records of repair and service operations; ability to make reports; ability to use tools and equipment to maintain and repair vehicular equipment; ability to follow written and oral directions; ability to comprehend technical data; ability to establish and maintain effective working relationships with superiors and other employees.

*Id.* at 4-5.

The time for applicants to apply for the mechanic position closed on June 2, 2016. *Id.* at 4. Plaintiff applied for the mechanic position on May 21, 2016, but was disqualified. Docs. 97-13 at 4-5, 97-58 at 47. Consequently, the Personnel Board did not identify any qualified applicants for the mechanic position. Docs. 97-56 at 81, 97-58 at 46-47. The Personnel Board reopened the

mechanic position to applicants on June 16, 2016, and Plaintiff reapplied for the position on June 28, 2016. Docs. 97-11 at 2-4, 97-13 at 2-6, 97-58 at 47. Plaintiff was certified as a qualified applicant by the Personnel Board and was the only qualified applicant. Doc. 97-56 at 83, 86. In May or June 2016, MAWSS requested an update of Plaintiff's FMLA medical form. Doc. 97-56 at 62-64. On July 5, 2016, Plaintiff was referred by the Personnel Board to MAWSS for possible promotion to the mechanic position. Doc. 97-11 at 6. Sumrall recommended Plaintiff for the promotion. Doc. 97-57 at 21. Plaintiff was not hired for the mechanic position because of the information on his FMLA medical form that was related to his MS. Doc. 97-56 at 87.

On January 25, 2017, Plaintiff was served with a Predisciplinary Action Notice in which he was advised disciplinary action was contemplated against him for:

> Violation of Rule 14.2 of the Laws and Rules of the Personnel Board for Mobile County, Alabama, Section (c) conduct unbecoming an employee in the public service; and Section (j) Neglect of duty; and Section (l) failure to follow any lawful or reasonable regulations or order made and given by a superior officer. In addition, you have violated MAWSS HR Policy 08-01 Standards of Conduct; theft of MAWSS property (accessory).

Doc. 97-18 at 2. Further, the notice advised Plaintiff a hearing on the matter was set for January 26, 2017. *Id.* Plaintiff's predisciplinary hearing was held on February 9, 2017, and Plaintiff was notified the hearing panel recommended he be suspended for fifteen (15) days, without pay, for violating the rules and policies that were set forth in the Predisciplinary Action Notice. Doc. 97-19. The predisciplinary hearing panel found:

> On November 10, 2016, you were seen on surveillance camera accepting personal property (Vehicle Headliners) from a MAWSS employee. You admitted during the hearing that you repaired the employee's personal headliner on MAWSS time and while using MAWSS materials to make the repair. This is neglect of duty and conduct unbecoming an employee in public service.
>
> On November 11, 2016, the very next day, you were also seen on surveillance camera aiding and abetting an employee to commit theft. You placed a set of windshield wiper blades in the corner near the bay door of the small-engine room

where you work.  Within minutes, another employee came in and retrieved the windshield wiper blades from the exact spot you placed them in.  The employee then placed the windshield wipers under his pants leg, committing theft in your presence.  You told the hearing panel that you advised the employee that he would get in trouble, but you took no other action and allowed the employee to leave with the windshield wiper blades.  You are reminded that you are an employee for MAWSS and your job is to be responsible for the materials that are in the small-engine room where you work.  It is inexcusable to allow another employee to commit theft and it was inexcusable for you to make the items available for him to steal.  There are procedures in place for handing out materials to employees in the Garage.  You failed to follow the procedure and never created a work order for the windshield wipers.

That is a violation of the Water Board Policy HR 08-01 HR 08-01 Standards of Conduct (Theft).  This is unacceptable behavior for a MAWSS employee.

*Id.*

Two (2) days before Plaintiff's predisciplinary hearing, on February 7, 2017, the EEOC received a charge of discrimination against MAWSS from Plaintiff.  Doc. 97-33 at 4-6.  The EEOC, in turn, issued a Notice of Charge of Discrimination to MAWSS on February 9, 2017, the day of Plaintiff's predisciplinary hearing.  *Id.* at 2-7.

On February 21, 2017, Plaintiff filed his appeal of the predisciplinary hearing panel's recommendation to the Personnel Board in which he noted the recommended disciplinary action was "too severe," he was "not guilty of the charges brought against [him]," and it was "retaliation for filing EEOC charges."  Doc. 97-35 at 4.  On September 19, 2017, the Personnel Board held Plaintiff's appeal hearing before a panel.  Doc. 90-10 at 10.  The Personnel Board panel found and concluded:

[Plaintiff] repaired the headliner for Rollo's private benefit while working on MAWSS time using public facilities and adhesive.  [Plaintiff] argues that past informal practice countenanced use of garage facilities for minor repairs of personal items.  Personnel Board and MAWSS policy is to the contrary, and [Plaintiff] violated that policy.

The Board finds from a careful review of the video evidence, and from [Plaintiff's] testimony, that [Plaintiff] placed the wiper blades by the garage door with the

expectation that Turner would take them for non-work related use.  Turner arrived at the shop without the truck on which [Plaintiff] said he was supposed to install the wipers.  [Plaintiff] was kneeling right in front of Turner when Turner brazenly concealed the wipers first in his pants leg, then in his jacket.  Turner was obviously unconcerned that [Plaintiff] would see these antics, but he hid the blades so that others would not see the blades when they were carried outside the shop.  The Board does not find credible [Plaintiff's] claim that he did not know that Turner left with the blades and then completely forgot about what became of the garage's blades once Turner left.

The Appointing Authority has demonstrated to the Board's satisfaction that [Plaintiff] violated Personnel Board Rule 14.2(c), (j) and (l) by conducting personal work on public time and by diverting publicly purchased materials to further personal interests.  There is no *de minimus* exception to the rule, and in any event, the Board does not consider the headliner repair or the disappearance of the wiper blades to be *de minimus*.

Personnel Board Rule 14.7 provides that "the hearing on appeal shall be *de novo*, and the Board may rescind, modify, alter, of affirm the penalty or action of the Appointing Authority, or may impose such additional or different penalty as may be warranted by the evidence adduced at the hearing."  See *Mobile County Personnel Bd. v. City of Mobile*, 833 So. 2d 641, 643 (Ala. Civ. App. 2002).  The Board has considered *de novo* the appropriate penalty.  The records show that [Plaintiff] has been recognized as a good employee.  However in light [of] his conduct on November 10 and November 11, 2016, a 15-day suspension, without pay, is an appropriate sanction.

Doc. 90-10 at 15-16.  Ultimately, the Personnel Board panel affirmed Plaintiff's fifteen (15) day

suspension.  *Id.* at 16.

### III.   STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R.

CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is

no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter

of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258,

1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a

matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).[3]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id.*

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial.  *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348,

---

[3] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

1356, 89 L. Ed. 2d 538 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).  The court must view the facts and draw all reasonable inferences in favor of the non-moving party.  *Id*. (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356 (citations omitted).  Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).  "Speculation does not create a *genuine* issue of fact."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted).  In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## IV.    DISCUSSION AND ANALYSIS

The Court will first address the motions to strike and then will address the motion for summary judgment.

A.    **Motions to Strike**

    i.    **Defendants' Motion to Strike Affidavit of Kyle Bosarge (Doc. 106)**

Defendants request the Court strike the Affidavit of Kyle Bosarge ("Plaintiff's affidavit")

that was filed as Exhibit B with Plaintiff's response to Defendants' motion for summary judgment.[4]

Doc. 106 at 1.  Defendants argue Plaintiff's affidavit is due to be stricken pursuant to the Eleventh

Circuit's sham-affidavit rule because Plaintiff's affidavit contains statements that directly conflict

with his deposition statements and other statements that he made under oath, and his physician's

deposition statements.  *Id.*

In response, Plaintiff argues Defendants' only cognizable objection to Plaintiff's affidavit

is "evidence cannot be presented in admissible form, not that the evidence has not been presented

in admissible form," and based on that objection, Plaintiff's affidavit is not prohibited under Fed.

R. Evid. 1002 and Plaintiff's lay opinions are admissible.  Doc. 109 at 1-5 (emphasis omitted)

(quoting *Abbott v. Elwood Staffing Servs.*, 44 F. Supp. 3d 1125, 1135 (N.D. Ala. July 31, 2014)).

Plaintiff also argues Defendants' attempt to characterize Plaintiff's affidavit as a "sham" should

be rejected." *Id.* at 5-10.

> The Eleventh Circuit, in limited circumstances, allows a court to disregard an
> affidavit as a matter of law when, without explanation, it flatly contradicts his or
> her own prior deposition testimony for the transparent purpose of creating a genuine
> issue of fact where none existed previously. *See Tippens* [*v. Celotex Corp.*], 805
> F.2d [949,] 953-54 [(11th Cir. 1986)]; *Van T. Junkins & Assocs. v. U.S. Indus.*, 736
> F.2d 656 (11th Cir. 1984).  However, the rule only operates in a limited manner to
> exclude unexplained discrepancies and inconsistencies, as opposed to those "which

---

[4] The Court notes for the parties' future reference that, due to the 2010 amendments to Fed. R. Civ.
P. 56, a motion to strike exhibits that are attached to a motion for summary judgment is no longer
necessary.  *See* Fed. R. Civ. P. 56 (2010 advisory committee notes) ("Subdivision (c)(2) provides
that a party may object that material cited to support or dispute a fact cannot be presented in a form
that would be admissible in evidence.  The objection functions much as an objection at trial,
adjusted for the pretrial setting.  The burden is on the proponent to show that the material is
admissible as presented or to explain the admissible form that is anticipated.  There is no need to
make a separate motion to strike.").

create an issue of credibility or go to the weight of the evidence." *Tippens*, at 953; *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012) (stating, "[where] the apparent contradiction derives not from purposeful fabrication but instead from dialectical misunderstanding . . . any apparent contradiction becomes 'an issue of credibility or go[es] to the weight of the evidence'") (alterations in original). Put differently, "[a]n opposing party's affidavit should be considered although it differs from or varies [from] his evidence as given by deposition or another affidavit and the two in conjunction may disclose as issue of credibility." *Tippens*, at 953 (quoting *Moore's Federal Practice* § 56.15 (2d ed. 1985)) (alterations in original). In any case, the rule should be applied "sparingly because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007) (quoting *Rollins v. TechSouth*, 833 F.2d 1525, 1530 (11th Cir. 1987)) (internal brackets omitted).

*Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306-07 (11th Cir. 2016).

With the preceding standard of review in mind, the Court will address in turn each of Defendants' objections to certain paragraphs of Plaintiff's affidavit as they are presented in their motion.[5]

### a.        Paragraph Two (2)

Defendants argue Plaintiff implies in paragraph two (2) of his affidavit he applied for FMLA leave to deal with absences that were "related to some recent medication changes" and those absences were "directly related to this new treatment protocol," but his FMLA leave request form indicated only "diagnosed w/ MS" as the reason for his leave request. *Id.* (quoting Docs. 97-20 at 2, 97-53 ¶ 2). The Court notes, Plaintiff's FMLA leave request form is not deposition testimony that may be contradicted, as contemplated by the sham-affidavit rule, and the form is not made under oath. *See* Doc. 97-20 at 2. Despite these disqualifiers, the Court finds Plaintiff's affidavit paragraph two (2) does not contradict his reason for his leave request that he gave in his FMLA leave request form. Rather, the Court finds Plaintiff's affidavit paragraph two (2) merely

---

[5] To be clear, the rulings herein pertain to the motion for summary judgment and is not necessarily the same standard that would be applied at trial as the rules on hearsay are relaxed for summary judgment so long as it can be provided in an admissible form at trial.

affects the weight given to Plaintiff's FMLA leave request form.   Accordingly, Defendants' objection to Plaintiff's affidavit paragraph two (2) is overruled.

### b.      Paragraph Five (5)

Defendants argue Plaintiff states in paragraph five (5) of his affidavit "in June, 2016, my medical condition stabilized," but in his May 2, 2019 deposition, he testified Dr. Millette updated Plaintiff's FMLA medical form on June 17, 2017, and indicated Plaintiff experienced vision loss, fatigue, and extremity weakness and he would experience these symptoms every three (3) to six (6) weeks for between three (3) to five (5) days.   Doc. 106 at 3.   The Court finds Plaintiff's statement does not directly contradict his acknowledgment of Dr. Millette's evaluation, but sets up an issue of credibility of whether Plaintiff's condition stabilized in June 2016.   Accordingly, Defendants' objection to Plaintiff's affidavit paragraph five (5) is overruled.

### c.      Paragraph Nine (9)

Defendants argue Plaintiff states in paragraph nine (9) of his affidavit, in early June 2016, he was given an FMLA medical form and Washington asked him to have it filled out and then return it to her, but he did not do so because he claimed he did not need an accommodation other than for his heat intolerance.   *Id.*   However, in Plaintiff's deposition, Defendants argue he acknowledged he sent the FMLA medical form to Dr. Millette through a friend and Plaintiff believed Dr. Millette's office faxed the completed form to MAWSS.   *Id.*; *see also* Doc. 104-1 at 16-17.   The Court notes in Plaintiff's affidavit paragraph nine (9), he generally refers to an FMLA medical form that he was provided in early June 2016, while in his deposition that Defendants cite, he is directed to describe events that surrounded a specific FMLA medical form that was completed by Dr. Millette on June 17, 2016.   *Compare* Doc. 97-53 ¶ 9 *with* Docs. 90-10 at 6-9, 104-1 at 15-18.   Therefore, Plaintiff's affidavit paragraph nine (9) does not directly contradict his deposition

testimony, and Defendants' objection to Plaintiff's affidavit paragraph nine (9) is overruled.

### d.   Paragraph Thirteen (13)

Defendants argue Plaintiff states in paragraph thirteen (13) of his affidavit, on August 19, 2016, MAWSS directed him to complete and return an "ADA Accommodation Request Form," which he did not return because he claimed he did not need an accommodation other than for his heat intolerance.  Doc. 106 at 4.  Defendants argue, in Plaintiff's deposition, he was questioned extensively about the August 19, 2016 meeting at which his driving restrictions were discussed, and he did not mention an "ADA Accommodation Request Form," but he did acknowledge he sent an FMLA medical form to Dr. Millette to update his FMLA information.  *Id.*  Defendants have not shown Plaintiff directly contradicted his previous testimony about which form was completed, and the discrepancy merely raises an issue of credibility.  Accordingly, Defendants' objection to Plaintiff's affidavit paragraph thirteen (13) is overruled.

### e.   Paragraphs Seven (7), Eight (8), and Ten (10)

Defendants argue Plaintiff states in paragraphs seven (7), eight (8), and ten (10) of his affidavit he was properly certified for the mechanic position after he submitted updated information about his job experience to the Personnel Board, but in his deposition, he revealed the updated information was false. Doc. 106 at 4.  Defendants argue Plaintiff states in paragraph seven (7) of his affidavit, after the Personnel Board initially disqualified him for the mechanic position, he discussed his application form with a Personnel Board employee named Veletta, who told Plaintiff he failed to provide the Personnel Board with the functions and duties he previously performed; in paragraph eight (8) of his affidavit, he states he revised his application; and in paragraph ten (10), he states the Personnel Board notified him he was certified for the mechanic position after he revised his application.  *Id.* at 4-5.  Defendants argue, in Plaintiff's deposition, he

revealed his revised application contained false information about his past work experience and he stated Veletta told him to add the required skills for the mechanic position to his revised application. *Id.* at 5. The Court finds Plaintiff's affidavit paragraphs seven (7), eight (8), and ten (10) do not directly contradict his deposition testimony. Whether Plaintiff provided false information on his revised application for the mechanic position would be a credibility issue. Accordingly, Defendants' objection to Plaintiff's affidavit paragraphs seven (7), eight (8), and ten (10) is overruled.

### f.    Paragraph Twelve (12)

Defendants argue Plaintiff states in paragraph twelve (12) of his affidavit he complained of discrimination at the August 19, 2016 meeting with King and Washington, when he was given the letter that informed him his driving duties were removed. *Id.* at 5. Defendants argue, in Plaintiff's deposition, he did not complain of discrimination at the meeting, but asked the reason for the decision and stated other employees were afforded benefits that are not given to everyone. *Id.* The Court finds Plaintiff's affidavit paragraph twelve (12) does not directly contradict his deposition testimony, but can be interpreted as Plaintiff's characterization of what he said at the meeting. Accordingly, Defendants' objection to Plaintiff's affidavit paragraph twelve (12) is overruled.

### g.    Paragraph Fifteen (15)

Defendants argue Plaintiff states in paragraph fifteen (15) of his affidavit Dr. Millette told him Defendants made a medical request in June 2016 and Dr. Millette advised Plaintiff not to send Defendants the medical file and told Plaintiff he would send Defendants the FMLA medical form. *Id.* at 6. Defendants argue Plaintiff did not present this evidence in his deposition, or otherwise, nor did Dr. Millette testify to the fact. *Id.* The Court finds Plaintiff's affidavit paragraph twelve

(12) does not directly contradict his deposition testimony and is an issue of credibility. *Id.*
Accordingly, Defendants' objection to Plaintiff's affidavit paragraph fifteen (15) is overruled.[6]

      **h.**      **Paragraph Sixteen (16)**

Defendants argue Plaintiff states in paragraph sixteen (16) of his affidavit, from July
through December 2016, he voiced complaints of discrimination to King, Washington, Sumrall,
and other MAWSS employees because he was not selected for the mechanic position. *Id.* at 6.
Defendants argue, in Plaintiff's deposition, he did not mention this information, only mentioned
he communicated with King during an August 19, 2016 meeting, and stated he could not recall if
he had any conversations with either King or Washington after the August 19, 2016 meeting. *Id.*
Defendants argue, in Plaintiff's deposition, he made formal complaints to Sumrall who would call
Washington, but Plaintiff said he did not hear such conversations, and he left voicemails with
Washington, but did not go to HR. *Id.* at 7. The Court finds Plaintiff's affidavit paragraph sixteen
(16) does not directly contradict his deposition testimony, the cited portions of which refer to
formal complaints of discrimination as opposed to general complaints of discrimination that
Plaintiff describes in his affidavit. *Compare* Doc. 97-53 ¶ 16 *with* Doc. 104-1 at 28-33.
Accordingly, Defendants' objection to Plaintiff's affidavit paragraph sixteen (16) is overruled.

      **i.**      **Paragraph Seventeen (17)**

Defendants argue Plaintiff states in paragraph seventeen (17) of his affidavit, King and
Washington refused to take his calls or meet with him and ignored his request to see medical
documentation from Dr. Millette that stated Plaintiff could not drive. Doc. 106 at 7. Defendants
argue, in Plaintiff's deposition, he stated the only conversation that he had with King occurred

---

[6] However, this ruling also assumes Plaintiff intended to present the information from Dr. Millette
in an admissible format and hearsay is not applicable.

when he was given the August 19, 2016 letter and Plaintiff's exhibits that were submitted with his response to Defendants' motion for summary judgment show Washington communicated with him about his driving restriction. *Id.* at 7-8. The Court finds Plaintiff's affidavit paragraph seventeen (17) does not directly contradict his deposition testimony and is hyperbole that goes to the issue of credibility. Accordingly, Defendants' objection to Plaintiff's affidavit paragraph seventeen (17) is overruled.

### j.    Paragraph Eighteen (18)

Defendants argue Plaintiff states in paragraph eighteen (18) of his affidavit he could perform the required functions and duties of his position and the mechanic position, and only required an accommodation for his heat intolerance. *Id.* at 8. Defendants argue, in Plaintiff's deposition, he stated he experienced a variety of symptoms that were reflected in his FMLA medical form. *Id.* The Court finds Plaintiff's affidavit paragraph eighteen (18) does not directly contradict his deposition testimony and is an issue of credibility. Accordingly, Defendants' objection to Plaintiff's affidavit paragraph eighteen (18) is overruled.

### k.    Paragraph Nineteen (19)

Defendants argue Plaintiff states in paragraph nineteen (19) of his affidavit, on October 20, 2016, he obtained a "medical clearance letter" from Dr. Millette, the contents of which cleared him to perform all of the duties of his position, including driving. *Id.* Defendants argue the letter is addressed "To Whom It May Concern," does not reference the Plaintiff's job duties, is not addressed to MAWSS, does not have a recipient address, and referenced only Plaintiff's "current" condition. *Id.* Defendants further argue, in Dr. Millette's deposition, he did not remember he wrote the letter and it looked like something he might have written. *Id.* at 8-9. Finally, Defendants argue, in Plaintiff's deposition, he stated he asked Dr. Millette to write the letter, Plaintiff obtained

it from Dr. Millette, Plaintiff gave it to Sumrall, Plaintiff did not know what Sumrall did with the letter, Plaintiff did not put it in the inter-office mail because it was not in an envelope, he did not know he needed to take it to HR, and he acknowledged he did not attempt to talk to HR about the letter or ask if HR received it.  *Id.* at 9.  The Court finds Plaintiff's affidavit paragraph nineteen (19) directly contradicts his deposition insofar as Plaintiff states in his affidavit Sumrall said he would get the letter to HR, Plaintiff saw Sumrall place the letter in the inbox, and Sumrall indicated to Plaintiff he delivered the envelope to HR.  Plaintiff does not explain the discrepancy between his affidavit paragraph nineteen (19) in which he describes what occurred after he gave the letter to Sumrall and his deposition testimony in which he stated he did not know what happened to the letter after he gave it to Sumrall.  *Compare* Doc. 97-53 *with* Doc. 104-1 at 26.  Therefore, Defendants' objection to Plaintiff's affidavit paragraph nineteen (19) is sustained insofar as Plaintiff states in his affidavit Sumrall said he would get the letter to HR, Plaintiff saw Sumrall place the letter in the inbox, and Sumrall indicated to Plaintiff he delivered the envelope to HR. Defendants' remaining objection to Plaintiff's affidavit paragraph nineteen (19) is overruled.

### l.      Paragraphs Twenty-One (21) Through Thirty-One (31)

Defendants argue Plaintiff attempts in paragraphs twenty-one (21) through thirty-one (31) of his affidavit to revisit his predisciplinary and Personnel Board appeal hearings, and asserts facts that he alleged and were challenged at those hearings.  Doc. 106 at 9-10.  Defendants argue the Court should not second-guess the decisions of the hearing boards.  *Id.*  Since Defendants have not shown Plaintiff's affidavit paragraphs twenty-one (21) through thirty-one (31) directly contradict his deposition testimony, but echo his previous testimony, Defendants' objection to Plaintiff's affidavit paragraphs twenty-one (21) through thirty-one (31) is overruled.

### m.    Paragraphs Thirty-Three (33) Through Thirty-Five (35)

Defendants argue Plaintiff attempts in paragraphs thirty-three (33) through thirty-five (35) of his affidavit to revisit another incident from his predisciplinary and Personnel Board appeal hearings and states his co-employee Turner asked for windshield wipers for his company truck. *Id.* at 10-11.  Defendants argue, at Plaintiff's predisciplinary and appeal hearings, he stated Turner did not have a company truck and Plaintiff did not know for which vehicle he procured the windshield wipers.  *Id.* at 11.  The Court finds Plaintiff's affidavit paragraphs thirty-three (33) through thirty-five (35) do not directly contradict any of Plaintiff's deposition testimony, but since the affidavit testimony does conflict with his prior testimony that was given under oath at a previous hearing and the fact that the subject of the affidavit testimony is outside the scope of the Court's review, it raises an issue of credibility.  Accordingly, Defendants' objection to paragraphs thirty-three (33) through thirty-five (35) is overruled.

### n.    Paragraph Thirty-Eight (38)

Defendants argue Plaintiff mischaracterizes in paragraph thirty-eight (38) of his affidavit Washington's response to his request that she provide him documentation from his doctor that he was restricted from driving.  *Id.*  The Court finds Plaintiff's affidavit paragraph thirty-eight (38) does not directly contradict any of Plaintiff's deposition testimony and is an issue that goes to the weight of the evidence.  Accordingly, Defendants' objection to paragraph thirty-eight (38) is overruled.

### o.    Paragraphs Fifty (50)

Defendants argue Plaintiff states in paragraph fifty (50) of his affidavit he was retaliated against when his job duties were modified and he was required to remain in the small-engine room and perform work on only small engines after the Personnel Board appeal hearing on September

20, 2017.  *Id.* at 11-12.  Defendants argue in Plaintiff's testimony from the July 18, 2017 Personnel Board appeal hearing he stated he was an Auto Service Worker II who worked on small engines and, in his deposition, he stated he had worked in the small-engine area of the MAWSS garage since the facility moved locations in 2015.  *Id.* at 12.  The Court finds Plaintiff's affidavit paragraph fifty (50) does not directly contradict any of Plaintiff's deposition testimony.  Accordingly, Defendants' objection to paragraph fifty (50) is overruled.

> ## p.  Paragraph Fifty-One (51)

Defendants argue Plaintiff states in paragraph fifty-one (51) of his affidavit he was assigned new duties after September 20, 2017, and those new duties did not require him to use his auto-mechanic certifications.  *Id.*  Defendants argue Plaintiff did not produce any such certifications, and he was only certified for the mechanic position by the Personnel Board.  *Id.* at 12-13.  The Court finds Plaintiff's affidavit paragraph fifty-one (51) does not directly contradict any of Plaintiff's deposition testimony.  Accordingly, Defendants' objection to paragraph fifty-one (51) is overruled.

> ## q.  Paragraph Fifty-Three (53)

Defendants argue Plaintiff states in paragraph fifty-three (53) of his affidavit he is assigned to perform general mechanic duties instead of small-engine repairs.  *Id.* at 13.  Defendants argue those allegations are not relevant to the issues in this matter.  *Id.*  The Court finds Plaintiff's affidavit paragraph fifty-three (53) does not directly contradict any of Plaintiff's deposition testimony.  Accordingly, Defendants' objection to paragraph fifty-three (53) is overruled.

> ## r.  Paragraph Fifty-Four (54)

Defendants argue Plaintiff states in paragraph fifty-four (54) of his affidavit the "MAWSS EEO policies and procedures are totally defective and ineffective."  *Id.*  Defendants argue Plaintiff

is neither an expert on the subject nor has provided evidence to support his opinion. *Id.* The Court finds Plaintiff's affidavit paragraph fifty-four (54) does not directly contradict any of Plaintiff's deposition testimony and merely states his lay opinion. Accordingly, Defendants' objection to paragraph fifty-four (54) is overruled.

### s.    Paragraph Fifty-Six (56)

Defendants argue Plaintiff states in paragraph fifty-six (56) of his affidavit he believes King and Washington discriminated against him because he did not have either limitations or physician restrictions that would make him unable to perform his job duties. *Id.* Defendants argue Plaintiff's statement ignores the medical issues that were documented by Dr. Millette in the FMLA medical form and conflicts with Plaintiff's deposition testimony in which he acknowledged Dr. Millette's conclusions from the FMLA medical form. *Id.* The Court finds Plaintiff's affidavit paragraph fifty-six (56) does not directly contradict any of Plaintiff's deposition testimony. Accordingly, Defendants' objection to paragraph fifty-six (56) is overruled.

### t.    Paragraph Fifty-Seven (57)

Defendants argue Plaintiff states in paragraph fifty-seven (57) of his affidavit he believes he was a target of retaliation. *Id.* Defendants do not cite to deposition testimony that conflicts with Plaintiff's affidavit statement. *See id.* The Court finds Plaintiff's affidavit paragraph fifty-seven (57) does not directly contradict Plaintiff's deposition testimony and merely states his subjective belief. Accordingly, Defendants' objection to paragraph fifty-seven (57) is overruled.

### ii.    Motion to Strike Deposition Testimony of Dr. Millette (Doc. 108)

Plaintiff requests the Court strike the deposition testimony of Dr. Millette because he was not licensed to practice medicine at the time of his deposition due to his diagnosis of PTSD and

issues with memory and recollection.[7]  Doc. 108.  Plaintiff further argues Dr. Millette's testimony was inconsistent with his medical records that were contemporaneously created with his examination of Plaintiff.  *Id.*  The Court notes Plaintiff does not distill his arguments as to why Dr. Millette's testimony is inadmissible, but states general propositions.  *See id.*

In response, Defendants argue Dr. Millette was properly licensed at all relevant times and, at the time of his deposition, his health problems had been treated, and the best evidence rule does not apply to his testimony and opinions.  *Id.*  The Court will address each of Plaintiff's arguments in turn.

As to Plaintiff's objection that Dr. Millette was not licensed to practice medicine at the time of his deposition, Dr. Millette is not disclosed as an expert in this matter, and according to him, he was licensed and certified to practice neurology in the State of Mississippi while he treated Plaintiff from 2014 to 2018.  Doc. 109-7 at 34-36; *see also* Docket Sheet.  "A treating physician providing lay testimony can testify narrowly, limited to personal knowledge resulting from providing medical care, involving consultation, examination, or treatment of a patient plaintiff." *Chapman v. P&G Distrib., LLC*, 766 F.3d 1296, 1316 n.23 (11th Cir. 2014) (citing *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005)).  "But 'a treating doctor . . . is providing expert testimony if the testimony consists of opinions based on "scientific, technical, or other specialized knowledge" regardless of whether those opinions were formed during the scope of interaction with a party prior to litigation.'"  *Id.* (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 n.2 (7th Cir. 2004)).  Plaintiff has not shown Dr. Millette provided expert testimony that went beyond his personal knowledge of his treatment of Plaintiff.  Rather, Dr. Millette is

---

[7] The Court previously addressed why, due to the 2010 amendments to Fed. R. Civ. P. 56, a motion to strike exhibits that are attached to a motion for summary judgment is no longer necessary.  *Supra* note 4.

simply a fact witness who provided information in an admissible format. Therefore, Plaintiff's objection to Dr. Millette's deposition testimony based on the fact that he was not licensed to practice medicine at the time of his deposition is overruled.

As to Plaintiff's objection that Dr. Millette had issues with memory and recollection at the time of his deposition, he acknowledged at his deposition he experienced some "immediate memory loss," which was not "long-term," but felt his memory was "[m]uch better." Doc. 108-1 at 3. Plaintiff has not cited to any additional evidence that would show Dr. Millette is not competent to testify. Therefore, Plaintiff's objection to Dr. Millette's deposition testimony based on the fact that he had issues with memory and recollection at the time of his deposition is overruled.

As to Plaintiff's objection that the medical records are the best evidence and Dr. Millette's deposition testimony should be stricken based on that fact, the Court finds the best-evidence rule does not apply in this situation.

> The best evidence rule, codified as Federal Rule of Evidence 1002, requires the production of originals to prove the content of any writing, recording or photograph. FED. R. EVID. 1002; *United States v. Howard*, 953 F.2d 610, 612 n.1 (11th Cir. 1992) (per curiam). "The purpose of the best evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing." *United States v. Ross*, 33 F.3d 1507, 1513 (11th Cir. 1994). An original is not required if it is lost or destroyed, unless it has become unavailable through bad faith. FED. R. EVID. 1004.

*United States v. Guevara*, 894 F.3d 1301, 1309 (11th Cir. 2018). Plaintiff has not cited to an instance in which Dr. Millette's testimony was elicited to prove the content of any medical record. *See* Doc. 108. Therefore, Plaintiff's objection to Dr. Millette's deposition testimony based on the fact that the medical records are the best evidence is overruled.

**B.     Motion for Summary Judgment**

Defendants assert they are entitled to judgment as a matter of law as to all of the counts

that are brought against them.  The Court will address Defendants' arguments for judgment as a matter of law as to each count.

### i.     Counts 1 through 6 that are brought against King and Washington in their official capacities

Defendants argue Plaintiff brings claims in Counts 1 through 6 against King's and Washington's employer, the Board, and the same claim against them in their official capacities, which Defendants argue is superfluous and should be dismissed.  Doc. 89 at 9.  The Eleventh Circuit has held the ADA "does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996); *Rylee v. Chapman*, 316 F. App'x 901, 905 (11th Cir. 2009).  Moreover, official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985) (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55, 98 S. Ct. 2018, 2035 n.55, 56 L. Ed. 2d 611 (1978)). Therefore, insofar as Plaintiff seeks damages against King and Washington in their official capacities, Plaintiff's claim is redundant because he also sued the Board as his employer.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's ADA claims against King and Washington in their official capacities (Counts 1 through 6) is granted.

### ii.    Counts 1 through 6 that are brought against the Board pursuant to § 504 of the Rehabilitation Act

Defendants argue Plaintiff's claims in Counts 1 through 6 pursuant to § 504 of the Rehabilitation Act should be dismissed because the Board denied it received federal financial assistance and Plaintiff has not presented evidence to rebut the Board's denial.  Doc. 89 at 9. Section 504 of the Rehabilitation Act mandates "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance."   29 U.S.C. § 794(a).   Section 504 further defines "program or

activity" as "all of the operations of . . . a department . . . of a State or of a local government."

§ 794(b)(1)(A).

> The Rehabilitation Act does not define "federal financial assistance."   Courts,
> however, have defined the term as used in the Rehabilitation Act to mean the federal
> government's provision of a subsidy to an entity.   *DeVargas v. Mason & Hanger-*
> *Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990) (finding that a defendant
> receives "federal financial assistance" within meaning of Rehabilitation Act when
> it receives a subsidy) (citing *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1208-
> 09 (9th Cir. 1984)); *see also Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F.
> Supp. 1257, 1264 (D.N.J. 1983) ("The term 'assistance' connotes a transfer of
> government funds by way of subsidy.").   Generally, "to determine the applicability
> of [the Rehabilitation Act], [a court] must determine whether the government
> intended to give [the defendant] a subsidy," as opposed to compensation.
> *DeVargas*, 911 F.2d at 1382; *accord Delmonte v. Dep't of Bus. & Prof'l*
> *Regulation, Div. of Alcoholic Beverages & Tobacco*, 877 F. Supp. 1563, 1565 (S.D.
> Fla. 1995).

*Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005).

Plaintiff claims the Board receives federal financial assistance, which Defendants denied

in their Answer to Plaintiff's First Amended Complaint, and Plaintiff did not rebut and did not

address, Defendants' denial in either of his motion for summary judgment responses.   Docs. 33 ¶¶

11, 115; 36 ¶¶ 11, 115; *see* Docs. 38, 97.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's claims pursuant

to § 504 of the Rehabilitation Act against the Board (Counts 1 through 6) is granted.

### iii.   Count 1 – interference claim pursuant to the ADA and § 504 of the Rehabilitation Act

In Count 1 of Plaintiff's Amended Complaint, he brings an interference claim pursuant to

the ADA and § 504 of the Rehabilitation Act against the Board, and King and Washington in their

official capacities.[8]  Doc. 33 at 17-19.  Plaintiff claims he is disabled pursuant to 42 U.S.C. §

12102, the Board is an employer pursuant to 42 U.S.C. § 12111(5), the Board is a public entity

pursuant to 42 U.S.C. § 12131(1), the Board receives federal financial assistance pursuant to § 504

of the Rehabilitation Act, he was able to perform the essential functions of his position either with

or without reasonable accommodations, he was not restricted to perform his work duties by Dr.

Millette, and Plaintiff was reassigned to work on small engines because of Defendants' biases

against him.  Doc. 33 ¶¶ 113-30.  Plaintiff's Count 1 is essentially a discrimination claim pursuant

to the ADA and § 504 of the Rehabilitation Act, and the Court will analyze Plaintiff's claim as

such.

Defendants argue Plaintiff's interference claim pursuant to the ADA and § 504 of the

Rehabilitation Act should be dismissed because he would be a direct threat to the health or safety

of himself and other individuals in the workplace if he was allowed to drive MAWSS vehicles, an

opinion that was based on the FMLA medical form.  Doc. 89 at 13-15.  In response, Plaintiff argues

King's and Washington's opinion that he was a direct threat was flawed because Dr. Millette's

October 2016 correspondence cleared Plaintiff to drive.  Doc. 97 at 13.

"Because the same standards govern discrimination claims under the Rehabilitation Act

and the ADA, [the Court will] discuss those claims together and rely on cases construing those

statutes interchangeably."  *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 2009)

(per curiam) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000)).  "The burden-

shifting analysis of Title VII employment discrimination claims is applicable to ADA claims."

---

[8] Based on the Court's previous rulings that granted Defendants' motion for summary judgment
as to Plaintiff's ADA claims that are brought against King and Washington in their official
capacities and as to Plaintiff's Rehabilitation Act claims against the Board, Counts 1 through 6 are
against the Board pursuant to the ADA, and against King and Washington in their official
capacities pursuant to the Rehabilitation Act.

*Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000)).  "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) he is disabled; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability."  *Id.* at 1255-56 (quoting *Earl*, 207 F.3d at 1365).  These elements create a presumption of discrimination, and the burden of production then shifts to Defendants to rebut the presumption by articulating a legitimate non-discriminatory reason for the discrimination.  *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).  "After [Defendants] makes this showing, the plaintiff has a full and fair opportunity to demonstrate that [Defendants'] proffered reason was merely a pretext to mask discriminatory actions."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (quoting *Bryant*, 575 F.3d at 1307-08).

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1)(A)-(C).

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

§ 12102(3)(A).  Defendants acknowledge in their summary judgment motion they regarded Plaintiff as physically impaired and limited in his ability to drive.  Doc. 89 at 11-12.

> In order to make out the second prong of his prima facie case, [Plaintiff] must prove that he is a "qualified individual" – that is, someone with a disability who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); *see also Earl*, 207 F.3d at 1365.  "Accordingly, an ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, . . . that he can perform the essential functions of his job with a reasonable accommodation."  *D'Angelo* [*v. ConAgra Foods, Inc.*], 422 F.3d [1220,]

1229 [(11th Cir. 2005)] (quotation marks omitted). An accommodation is "reasonable" and necessary under the ADA, in turn, only if it enables the employee to perform the essential functions of the job. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259-60 (11th Cir. 2001); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *see also* 29 C.F.R. § 1630.2(o)(1)(ii) ("The term reasonable accommodation means: . . . Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, *that enable a qualified individual with a disability to perform the essential functions of that position* . . . ." (emphasis added)). "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore not covered under the ADA. In other words, the ADA does not require the employer to eliminate an essential function of the plaintiff's job." *D'Angelo*, 422 F.3d at 1229 (quotation marks and alterations omitted). On the other hand "the ADA may require an employer to restructure a particular job by altering or eliminating some of its *marginal* functions." *Lucas*, 257 F.3d at 1260 (emphasis added).

*Holly*, 492 F.3d at 1256.

Defendants acknowledge Plaintiff was qualified for the mechanic position, but would be a direct threat to the health or safety of himself and other individuals in the workplace if he was allowed to drive MAWSS vehicles, which could not be eliminated by a reasonable accommodation. Doc. 89 at 12-15.

An individual is also not a "qualified individual" if, by performing the duties of a given position, he would pose a "direct threat" to himself. The ADA defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Regulations have extended the definition of "direct threat" to include threats to the worker himself. *See* 29 C.F.R. § 1630.2(r); *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 87, 122 S. Ct. 2045, 2053, 153 L. Ed. 2d 82 (2002) (upholding 29 C.F.R. § 1630.2(r)).

*Pinckney v. Potter*, 186 F. App'x 919, 925 (11th Cir. 2006) (per curiam).

At King's deposition, she acknowledged the FMLA medical form did not indicate Plaintiff was not able to drive, but stated Plaintiff's listed symptoms were a cause for concern. Docs. 90-4 at 10-12, 90-7 at 3-5. At Washington's deposition, she stated the decision to restrict Plaintiff from driving was a result of the symptoms that were listed on the FMLA medical form. Doc. 90-5 at 9-

11. In the August 19, 2016 letter from MAWSS to Plaintiff and signed by Washington, Plaintiff

was informed:

> We have reviewed all of the FMLA medical forms. Your doctor determined that
> you will be unable to perform some of your job duties because of heat intolerance.
> We have made accommodations by allowing you to use a fan while working in the
> garage and you are allowed to take breaks as needed. However, your doctor listed
> the following symptoms that you experience: loss of vision, dizziness, fatigue, and
> extremity weakness with spasticity. These symptoms present a safety hazard when
> operating MAWSS vehicles and equipment.
>
> We value you as an employee, and our first concern is your safety. You were
> notified by your supervisor verbally on August 9, 2016, that you are no longer
> permitted to drive or operate any of MAWSS vehicles or drivable equipment.
> Therefore, MAWSS will make the continued accommodation to provide a fan while
> you are working in the garage and allow frequent breaks as needed. We are also
> continuing the additional accommodation requiring that you do not drive to protect
> your safety and decrease MAWSS's liability of an accident occurring.

Doc. 90-9 at 4. In a December 7, 2016 email from Washington to McWhorter, with King carbon

copied, Washington stated:

> [Plaintiff] called, he wants a copy of where the doctor said he could not drive. I
> explained to him the doctor did not say that. We (MAWSS, HR) made that
> determination based on the doctors [sic] information on the FMLA. I advised him
> of the loss of vision, dizziness, fatigue, and extremity weakness with spasticity.
> These symptoms present a safety hazard when operating MAWSS vehicles and
> equipment.

Doc. 90-9 at 7.

In Plaintiff's June 17, 2016 FMLA medical form, Dr. Millette noted:

- Plaintiff's MS commenced in 2009;

- it is a permanent condition;

- Plaintiff was prescribed medication to treat his MS;

- Plaintiff was unable to perform some of his job functions due to his heat intolerance;

- Plaintiff could experience loss of vision, fatigue, and extremity weakness with spasticity;

- Plaintiff would be incapacitated for a single continuous period of time due to his MS for

an unknown period of time;

- Plaintiff's MS would cause episodic flare-ups that would periodically prevent him from performing his job functions;

- it would be medically necessary for Plaintiff to be absent from work during flare-ups of his MS for an unknown amount of time; and

- Plaintiff's flare-ups were estimated, over a six (6) month period, to occur every three (3) to six (6) weeks and would last between three (3) to five (5) days per episode.

Doc. 97-27 at 2-5.

Plaintiff argues, in Dr. Millette's October 20, 2016 letter, he cleared Plaintiff to drive. Docs. 97 at 15, 97-28 at 2. Plaintiff testified he gave Dr. Millette's letter to Sumrall to give to HR, Plaintiff did not know what Sumrall did with the letter, and Plaintiff did not take the letter to HR or speak with HR about the letter. Doc. 97-60 at 35-38. Sumrall, in his July 12, 2019 affidavit, denies he received the letter, and both King and Washington deny they saw the letter. Docs. 90-1 at 2, 97-56 at 123-24, 97-58 at 61-62. The Court sustained Defendants' objection to Plaintiff's affidavit paragraph nineteen (19) insofar as Plaintiff states in his affidavit Sumrall said he would get the letter to HR, Plaintiff saw Sumrall place the letter in the inbox, and Sumrall indicated to Plaintiff he delivered the envelope to HR. *Supra* section IV(A)(i)(k). Therefore, HR's perception that Plaintiff's symptoms were a cause for concern and he was a "direct threat" was reasonable since it was based on the FMLA medical form and Dr. Millette's letter was not delivered to HR.

The remaining issue is whether the perceived risk to the health or safety of others that was posed if Plaintiff was allowed to drive MAWSS vehicles could be eliminated by a reasonable accommodation.

> The plaintiff bears the burden of identifying an accommodation and showing that the accommodation would allow him to perform the essential functions of the job

in question.  [*Lucas*, 257 F.3d] at 1255-56.

> The Rehabilitation Act does not require employers to create new positions for employees with disabilities.  *Sutton v. Lader*, 185 F.3d 1203, 1210-11 (11th Cir. 1999) (stating that an employer "is under no obligation to hire an employee for a non-existent job," nor is it required to create a light-duty position for a disabled employee).  "Reassignment to another position is a required accommodation only if there is a vacant position available for which the employee is otherwise qualified."  *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997).  An employer is not required to promote the disabled employee or remove another employee from a position in order to accommodate the disabled employee.  *Lucas*, 257 F.3d at 1256.  When an employer provides a greater accommodation than that required under the Rehabilitation Act, it "incurs no legal obligation to continue doing so."  *Id.* at 1257 n.3.

*Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017).  Plaintiff argues, "[a]t a minimum, driving restrictions could have been contained to periods of Multiple Sclerosis (MS) flare-up when symptoms were active."  Doc. 97 at 6.  The Court will apply Plaintiff's suggested accommodation to the mechanic position and his position as an Auto Service Worker.

As for the mechanic position, driving is an essential function, while it is not for an Auto Service Worker.  Docs. 90-1 at 2, 90-2 at 2.  Sumrall describes the driving responsibilities for one who is employed in the mechanic position:

> Persons employed as Vehicular Equipment Mechanics have the primary responsibility for repairing MAWSS's large combo trucks, vactor trucks, flatbed trucks, dump trucks, asphalt trucks, various sizes of work trucks, forklifts, and other vehicles and equipment.  When one of these vehicles breaks down at a location other than MAWSS premises, or develops a problem that makes it hazardous to operate, a Vehicular/Equipment Mechanic must get to the location of the disabled vehicle, diagnose the problem, make the needed repairs and/or get it running and get it back to the MAWSS facility.  If the vehicle's assigned operator has concerns or is unable to drive the vehicle back to MAWSS, the Mechanic drives it back.

> Sewer line backups, water line breaks, and other emergency situations require the use of MAWSS vehicles and equipment, frequently including combo trucks and/or other large vehicles.  If an emergency occurs at night, and a vehicle or piece of equipment develops a repair need, the Vehicular Equipment Mechanic on standby must go to the scene to take care of the situation.

> Vehicle/Equipment Mechanics must also be able to drive vehicles to diagnose

problems, and to test drive them after repairs have been made to determine if the repairs have been correctly performed.

Doc. 90-1 at 2.  Auto Service Workers have minimal driving responsibilities, which include driving to parts suppliers for supplies or to a dealer to gather information about a repair.  *See* Docs. 90-1 at 2, 97-60 at 30-32.

Based on the driving requirements of the mechanic position, Plaintiff's suggested accommodation of limited driving that is contingent on his MS flare-ups is not a reasonable accommodation that would allow him to perform the essential duties of the position.  For the Board to make such an accommodation for Plaintiff would be an undue hardship because it would alter the nature of the mechanic position.  Therefore, Plaintiff has not met the second prong of his *prima facie* case as to the mechanic position because he has not shown he was a qualified individual for the position.

As for Plaintiff's Auto Service Worker position, while driving was not an essential duty of the position, Plaintiff was restricted from the activity.  Docs. 97-24 at 5, 97-30 at 2, 97-53 at 2.  Therefore, Plaintiff has met the second prong of his *prima facie* case as to his Auto Service Worker position because he has shown he was a qualified individual for the position who could safely perform the duties of the position with a driving restriction.

"To establish the third element [of Plaintiff's *prima facie* case], he must show that he has suffered an adverse employment action because of his disability."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1445 (11th Cir. 1998)).  "Not all conduct by an employer negatively affecting an employee constitutes adverse employment action."  *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001).  "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment."  *Lucas*, 257 F.3d at 1261.  The "employee must show a serious

and material change in the terms, conditions, or privileges of employment . . . as viewed by a reasonable person in the circumstances." *Davis*, 245 F.3d at 1239.

Plaintiff argues his duties were modified because his large-engine responsibilities were removed and he was isolated from other employees. Doc. 97 at 11-13, 17-19. However, Plaintiff testified at his deposition he was in the small-engine area since 2015, when the shop was moved. Doc. 90-3 at 36. Further, Sumrall testified Plaintiff did not have "specific duties" and performed "general duties or no assignments," and Lynn testified Plaintiff was not the only MAWSS employee who performed small-engine repairs, but he was "good at it" and his "name would come up first" for small-engine repairs. Doc. 90-6 at 4-5, 90-8 at 6-7. Sumrall also testified he assigned Plaintiff to the small-engine area because of Plaintiff's "illness and the fumes and stuff" and Sumrall "felt better for [Plaintiff] to be in a more comfortable zone than being up into an open area," which Sumrall stated was not an assignment. Doc. 90-6 at 6-7. The Court finds, as viewed by a reasonable person in the circumstances, Plaintiff has not shown a serious and material change in the terms, conditions, or privileges of his position as an Auto Service Worker. Therefore, Plaintiff has not met the third prong of his *prima facie* case as to his Auto Service Worker position because he has not shown he suffered an adverse employment action. Even if Plaintiff established his *prima facie* case, he is not able to show Defendants' proffered legitimate non-discriminatory reasons were pretextual.

Accordingly, Defendant's motion for summary judgment as to Plaintiff's discrimination claim (Count 1) is granted.

### iv.   Count 2 – retaliation claim pursuant to the ADA and § 504 of the Rehabilitation Act

In Count 2 of Plaintiff's Amended Complaint, he brings a retaliation claim pursuant to the ADA and § 504 of the Rehabilitation Act against the Board, and King and Washington in their

official capacities.   Doc. 33 at 19-20.   Plaintiff claims he raised issues and concerns about discriminatory practices by Defendants and they retaliated against him when they restructured his job duties, reprimanded and suspended him, gave him poor evaluations, and isolated him from other employees. *Id.* ¶¶ 131-36.

Defendants argue Plaintiff's retaliation claim pursuant to the ADA and § 504 of the Rehabilitation Act should be dismissed because he did not request a reasonable accommodation for the mechanic position because he argues he did not need a driving restriction, his predisciplinary hearing was scheduled prior to when he filed his EEOC charge, he did not present evidence that shows the predisciplinary hearing panel members knew he filed an EEOC charge, the Board had a reasonable and rational reason when it disciplined him, and he did not suffer an adverse employment action.  Doc. 89 at 15-18.

"The ADA prohibits retaliation against an individual for opposing an unlawful practice or making a charge under the ADA." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing 42 U.S.C. § 12203(a)).  ADA retaliation claims are analyzed under the same framework that is employed for retaliation claims that arise under Title VII.  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citing *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075-77 (11th Cir. 1996)); *Duble v. FedEx Ground Package Sys., Inc.*, 572 F. App'x 889, 895 (11th Cir. 2014).  "To prevail on [Plaintiff's] ADA retaliation claim, [he] must show that (1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White*, 818 F.3d at 1258 (citing *Lucas*, 257 F.3d at 1260).

> Once a *prima facie* case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation.  *See Goldsmith* [*v. City of Atmore*], 996 F.2d [1155,] 1163 [(11th Cir. 1993)].  The plaintiff must then demonstrate that

it will be able to establish at trial that the employer's proffered non-discriminatory reasons are a pretextual ruse designed to mask retaliation. *Cf. Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 440 (11th Cir. 1996).

*Stewart*, 117 F.3d at 1287.

"[T]o satisfy the first element of the *prima facie* case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (citations omitted). Plaintiff asserts he repeatedly reported complaints of discrimination, including his EEOC charge, while Defendants argue Plaintiff's "[v]ague allusions to complaints of discrimination do not amount to evidence of such" and they do not dispute he engaged in protected speech when he filed his charge with the EEOC. Docs. 97 at 16-17, 107 at 5-6. For purposes of this analysis, the Court assumes Plaintiff engaged in statutorily protected expression.

As to the second element of the *prima facie* case, Plaintiff's argument that he suffered an adverse employment action when, as he claims, his job duties were restructured and he was isolated from other employees, the Court previously determined such were not an adverse employment action. *Supra* section (IV)(B)(iii). Therefore, the remaining conduct that Plaintiff claims was retaliatory was his reprimand, suspension, and poor evaluations, all of which could be considered an adverse employment action because they had a "tangible, negative effect on [Plaintiff's] employment." *Lucas*, 257 F.3d at 1261.

As to the third element of the *prima facie* case, "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam) (citing *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000)). However, mere temporal proximity without more, must be "very close" and a three- to four-month

disparity between the statutorily protected expression and the adverse employment action is not enough. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (per curiam) (citations omitted).  Based on the facts presented, it does not appear Plaintiff made out his *prima facie* case.

However, even if Plaintiff made out his *prima facie* case for retaliation in regard to his reprimand, suspension, and poor evaluation, Defendants argue such actions were made for legitimate non-discriminatory reasons.  Doc. 107 at 6-9.  As stated in the February 16, 2017 MAWSS letter to Plaintiff, as a result of the predisciplinary hearing, the hearing panel recommended he be suspended based on two (2) acts that violated the Personnel Board's rules. Doc. 97-19 at 2-3.  The first act occurred on November 10, 2016, when Plaintiff accepted personal property from a MAWSS employee and made repairs to the personal property with MAWSS materials, which was captured on surveillance-camera footage.  *Id.*  The second act occurred on November 11, 2016, when Plaintiff placed near the bay door of the small-engine room a set of windshield wiper blades that another employee retrieved, an act for which Plaintiff did not create a work order and again was captured on surveillance-camera footage.  *Id.*  The decision of the predisciplinary-hearing board was upheld on appeal by the Personnel Board.  Doc. 90-10 at 15-16. The poor evaluation of which Plaintiff complains occurred subsequent to his predisciplinary hearing and appeal.  *Compare* Doc. 97-9 at 5 *with* Doc. 97-19 at 2.  Defendants, therefore, have shown legitimate non-discriminatory reasons that negate the inference of retaliation for Plaintiff's reprimand, suspension, and poor evaluation.

To rebut Defendants' legitimate non-discriminatory reasons for Plaintiff's reprimand, suspension, and poor evaluation, he argues the close temporal proximity of adverse acts to his

discrimination complaints infer a retaliatory motive,[9] his February suspension was suspect, the Board's deviation from custom and policies is evidence of pretext, the disparate treatment of comparatives infers a discriminatory motive, and inconsistent testimony infers pretext. Doc. 97 at 19-29.

Plaintiff claims he voiced numerous complaints from July 2016 through December 2016 and Defendants received reports he intended to sue MAWSS in August or September 2016 after which King and Washington initiated a campaign to punish him, including when they allegedly placed him under surveillance and suspended him for his conduct that took place in November 2016. *Id.* at 20. Further, Plaintiff claims he complained of discrimination after he received notice of his intended disciplinary action on January 25, 2017; February 6, 2017,when he filed his EEOC charge of discrimination; February 9, 2017, after his predisciplinary hearing; February 17, 2017, after he received his fifteen (15) day suspension; September 19, 2017, at the predisciplinary-hearing appeal; September 21, 2017, when he claims his duties were modified and he was assigned to only work in the small-engine-repair room;[10] and in 2018, when he received a poor evaluation that affected his ability to receive merit pay increases. *Id.* at 20-21.

Defendants argue, despite Plaintiff's alleged claims of discrimination, the reasons for his suspension were reasonable and the events that led to his suspension were prompted by Sumrall when he reported to HR a theft incident that he observed at his department. Doc. 107 at 6-7; *see also* Doc. 97-57 at 82-85. As a result, King contacted an investigation firm on December 1, 2016,

---

[9] As the Court previously discussed, temporal proximity without more is not enough. *Supra* section (IV)(B)(iv).

[10] The Court found, Plaintiff did not suffer an adverse employment action when, as he claims, his job duties were restructured and he was isolated from other employees, so the Court will not analyze whether this argument establishes pretext. *Supra* section (IV)(B)(iii).

to review video-surveillance footage for incidents of theft, the result of which was the investigation firm observed the theft incident that was reported by Sumrall.  Docs. 97-17 at 2-4, 97-58 at 74-75. Plaintiff's predisciplinary hearing and appeal followed, and his poor evaluation followed his appeal.  Docs. 90-10 at 10-16, 97-18, 97-19.

Based on the timeline of events, the Court finds the temporal proximity of Plaintiff's complaints of discrimination to his reprimand, suspension, and poor evaluation does not rebut the legitimate non-discriminatory reasons put forth by Defendants.  The mere fact Plaintiff may have raised the specter of discrimination does not mean an employer cannot discipline an employee's misdeeds.

As to Plaintiff's suspension, he argues there were discrepancies and inconsistencies that were associated with his suspension, including the discipline was delayed two and one-half (2.5) months, he was selectively targeted for discipline, repairs to personal property previously were not punished, and others who acted improperly were not contemporaneously disciplined.  Doc. 97 at 22-24.

The delay in discipline was reasonable due to proper notice of a hearing, assembly of the proper members of the hearing panel, and because of intervening holidays.  *See* Doc. 97-56 at 139-40 ("We have to schedule [hearings], make sure people are – Ms. McConaha has to be there, everybody who is on the panel has to be there. . . . I have to have a date, so the date has to be set in stone with everybody that's going to participate. . . . It could have been a variety of reasons, from scheduling, vacation, Mardi Gras, who knows.").  Further, Plaintiff cannot argue he was selectively targeted for discipline because the other parties who were involved in the two (2) incidents for which Plaintiff was disciplined, Rollo and Turner, were themselves disciplined; Rollo's predisciplinary hearing occurred in March 2017, after Plaintiff's predisciplinary hearing,

and Turner's predisciplinary hearing occurred in November 2016, before Plaintiff's predisciplinary hearing.  Docs. 97-48, 97-56 at 134-41.

Closely related to Plaintiff's selective-targeting argument, is his argument that others who acted improperly were not disciplined.  Plaintiff identifies four (4) employees who he claims received disparate treatment for conduct that Plaintiff claims was similar to his own for which he was punished.  Doc. 97 at 25-28.  However, Jason Simon was merely present in the same area, where he worked on equipment, as Plaintiff when the windshield wipers were taken, and Simon was not punished for the incident (Doc. 97-58 at 89-90); Samuel Wayne Baria stated he was permitted by Sumrall to repair his headliner, which was performed by Plaintiff, neither of whom were punished (Doc. 97-55 at 62-66),[11] and assisted Rollo to carry the headliner that Plaintiff repaired to Rollo's vehicle, an incident for which Plaintiff was punished and Baria was not, but Baria was later interviewed by Washington about the headliner incident (Doc. 97-56 at 157-58); and during a late-night emergency, Sumrall permitted Terrance Johnson to borrow for his trailer a few of MAWSS's tires that Johnson returned unused to MAWSS, an act for which both were reprimanded (Docs. 59, 97-56 at 7-9).

Plaintiff's cited incidents do not rebut Defendant's legitimate non-discriminatory reasons for Plaintiff's reprimand, suspension, and poor evaluation because the incidents are not substantively similar to his reprimanded conduct.  Simon was merely present when an incident occurred.  Baria was either permitted to do repair work for his personal-vehicle headliner by Sumrall or Sumrall, in fact, was unaware of the repair work, and neither Baria nor Plaintiff were

---

[11] Sumrall testified he did not know of anyone who had a personal-vehicle headliner that was repaired in the shop and he did not permit Baria to repair his personal vehicle headliner.  Doc. 97-54 at 13.  The fact that Baria was not punished if Sumrall did not know of, and did not report, the incident would not bolster Plaintiff's argument that such was pretextual.

punished for it.  Baria merely transported Rollo's personal-vehicle headliner, a lesser role than Plaintiff, who used MAWSS materials and made repairs to it.  Sumrall and Johnson were both reprimanded when Sumrall permitted Johnson to borrow MAWSS's tires.

Finally, Plaintiff argues his reprimand, suspension, and poor evaluation were pretextual because Defendants deviated from custom and policies when they ignored his complaints of discrimination, failed to report or investigate his complaints of discrimination, ignored its FMLA and discipline policies, and violated MAWSS's policies in regard to medical inquiries and his job reassignment.  Doc. 97 at 24-25.

Whether or not it was the policy of MAWSS to investigate verbal discrimination complaints or only those that are presented in writing, Plaintiff did not directly bring his claim of discrimination to HR until he filed his discrimination charge with the EEOC.  *See* Docs. 97-49 at 3; 97-55 at 29-31, 51-52; 97-56 at 22-27; 97-58 at 99-101; 97-60 at 43-44.

As to whether Defendants ignored its FMLA policies, Plaintiff does not specify which policy was violated and how, other than to say Defendants were provided sufficient medical documentation and additional documentation was unnecessary.  The MAWSS FMLA policy to which Plaintiff cites allows additional documentation for medical recertification after thirty (30) days, a second opinion, and clarifications from a healthcare provider.  Doc. 97-3 at 22.

As to whether Defendants ignored their discipline policies in regard to discipline consistency and to disciplinary documentation clarity, as previously discussed, the Court noted how the other cited employees' conduct was not substantively similar to Plaintiff's offending conduct and Plaintiff's offending conduct was noticed and a predisciplinary hearing and appeal were conducted.  *Supra* section (IV)(B)(iv); Docs. 97-10 at 10-16, 97-18 at 2, 97-19.

As to whether Plaintiff's claimed job reassignment was against MAWSS policy, the Court

found he was not, in fact, reassigned.  *Supra* section (IV)(B)(iii).

Accordingly, the Court finds Plaintiff has not carried his burden to show his reprimand, suspension, and poor evaluation were pretextual, and Defendants' motion for summary judgment as to Plaintiff's retaliation claim (Count 2) is granted.

### v.    Count 3 – retaliatory-hostile-work-environment claim pursuant to the ADA and § 504 of the Rehabilitation Act

In Count 3 of Plaintiff's Amended Complaint, he brings a retaliatory-hostile-work-environment claim pursuant to the ADA and § 504 of the Rehabilitation Act against the Board, and King and Washington in their official capacities.  Doc. 33 at 20-22.  Plaintiff claims he was subjected to a retaliatory, hostile, offensive, and abusive working environment because of his complaints of discrimination and Defendants knew of the hostile work environment.  *Id.* ¶¶ 137-46.

Defendants argue Plaintiff's retaliatory-hostile-work-environment claim should be dismissed because it is based on the fact that no one talks to him anymore, but he cannot show such conduct is part of a hostile work environment and is mere speculation.  Doc. 89 at 19-21.

"While the [Eleventh Circuit] has not yet addressed the issue, several other circuits have concluded that the ADA provides a cognizable claim for a disability-based hostile work environment."  *Cooper v. CLP Corp.*, 679 F. App'x 851, 853 n.2 (11th Cir. 2017) (per curiam) (citations omitted).  The Supreme Court has found cognizable a claim for hostile work environment under Title VII when it construed language from Title VII that is found in the ADA, which language states discrimination is prohibited in the "terms, conditions, and privileges of employment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (citing 42 U.S.C. § 2000e-2(a)(1)); *Cooper*, 679 F. App'x at 852 (citing *Harris*, 510 U.S. at 21, 114 S. Ct. at 370 and 42 U.S.C. § 12112(a)).  Therefore, the Court will use the analysis

for a hostile-work-environment claim under Title VII for Plaintiff's hostile-work-environment claim under the ADA.

"To prove a hostile work environment claim, an employee must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018) (citing *Harris*, 510 U.S. at 21, 114 S. Ct. at 370).

> To establish that harassment was sufficiently severe or pervasive to alter the terms or conditions of her employment, an employee must prove that her work environment was both subjectively and objectively hostile. *Mendoza v. Boden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). In other words, the employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21, 114 S. Ct. 367. Then she also must satisfy the objective component by showing that her work environment was one "that a reasonable person would find hostile or abusive." *Id. . . .*
>
> Turning to the objective inquiry, we consider four factors when evaluating whether harassment was objectively hostile: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct reasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. Although these factors help guide the inquiry, "the objective element is not subject to mathematical precision." *Bryant* [ ], 575 F.3d [at] 1297 [ ]. We must view the evidence "cumulatively and in the totality of the circumstances." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010).

*Smelter*, 904 F.3d at 1285.

Plaintiff generally cites to "facts set forth above" and "adverse acts and modifications of his duties in August, 2016, and September, 2017" as support for his retaliatory-hostile-work-environment claim. Doc. 97 at 29-30. The Court found Plaintiff's driving restrictions were reasonable because they were based on the FMLA medical form and Dr. Millette's letter was not delivered to HR. *Supra* section (IV)(B)(iii). The Court also found Plaintiff did not suffer an adverse employment action when he claims his job duties were restructured and he was isolated

from other employees, and Plaintiff did not establish a claim of retaliation. *Supra* section (IV)(B)(iii). As for Plaintiff's complaint that no one goes to the small-engine room to talk with him since he filed his EEOC complaint, he acknowledges his perceived reasons for the hostility are based on speculation, and the Court does not find the conduct objectively hostile since he does not allege the conduct interfered with his job performance or that the conduct involved any conduct more severe than not socializing with him. Doc. 90-3 at 36-37.

Accordingly, the Court finds Plaintiff has not carried his burden to show his workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.

Defendants' motion for summary judgment as to Plaintiff's retaliatory-hostile-work-environment claim (Count 3) is granted.

### vi.    Count 4 – failure-to-promote claim pursuant to the ADA and § 504 of the Rehabilitation Act

In Count 4 of Plaintiff's Amended Complaint, he brings a failure-to-promote claim pursuant to the ADA and § 504 of the Rehabilitation Act against the Board, and King and Washington in their official capacities. Doc. 33 at 22. Plaintiff claims he was denied a promotion because of his medical condition and/or disability. *Id.* ¶¶ 147-151.

Defendants argue Plaintiff's failure-to-promote claim should be dismissed because Defendants' decision not to promote him was based on his driving restriction and there was not a reasonable accommodation for Plaintiff to perform the essential function of driving for the mechanic position. Doc. 89 at 21.

"In the absence of direct evidence, we must proceed with the *McDonnell Douglas* analysis used [ ] for [a] Title VII claim." *Standard*, 161 F.3d at 1333. "To establish [a] *prima facie* case of discriminatory failure to promote, [Plaintiff] must show that (1) he was in a protected group;

(2) he was not given the promotion; (3) he was qualified for the position and (4) someone outside of the protected group was given the position." *Id.* (citing *Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995)). These elements create a presumption of discrimination, and the burden of production then shifts to Defendants to rebut the presumption by articulating a legitimate non-discriminatory reason for the discrimination. *Bryant*, 575 F.3d at 1307. "After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that [Defendants'] proffered reason was merely a pretext to mask discriminatory actions." *Brown*, 597 F.3d at 1181-82 (quoting *Bryant*, 575 F.3d at 1307-08).

The Court notes Plaintiff has not made out his *prima facie* case of discriminatory failure to promote because he has not identified someone who was not disabled and was hired for the mechanic position. The Court also found HR's perception that Plaintiff's symptoms were a cause for concern and he was a "direct threat" was reasonable since it was based on the FMLA medical form and Dr. Millette's letter was not delivered to HR. *Supra* section (IV)(B)(iii). Finally, the Court found Plaintiff was not a qualified individual for the mechanic position because, based on the driving requirements of the mechanic position, his suggested accommodation of limited driving that was contingent on his MS flare-ups was not a reasonable accommodation that would allow him to perform the essential duties of the position and for the Board to make such an accommodation for him would be an undue hardship because it would alter the nature of the position. *Supra* section (IV)(B)(iii).

Even if Plaintiff made out his *prima facie* case of discriminatory failure to promote, Plaintiff has not shown Defendants' legitimate non-discriminatory reasons for why he was not promoted were pretextual.

Accordingly, the Court finds Plaintiff has not carried his burden to show he was

discriminated against when he was not promoted to the mechanic position.

Defendants' motion for summary judgment as to Plaintiff's failure-to-promote claim (Count 4) is granted.

### vii.   Count 5 – constructive-demotion-and/or-forced-reassignment claim pursuant to the ADA and § 504 of the Rehabilitation Act

In Count 5 of Plaintiff's Amended Complaint, he brings a constructive-demotion-and/or-forced-reassignment claim pursuant to the ADA and § 504 of the Rehabilitation Act against the Board, and King and Washington in their official capacities.  Doc. 33 at 22-24.  Plaintiff claims he raised issues and concerns about Defendants' discriminatory practices and, as a result of his complaints and disability, Defendants retaliated against him when they restructured his job duties and assignments, which effectively was a demotion.  *Id.* ¶¶ 152-59.

Defendants argue Plaintiff's constructive-demotion-and/or-forced-reassignment claim should be dismissed because the Eleventh Circuit does not recognize constructive-demotion and/or forced-reassignment claims as an independent claim under Title VII, but as a general Title VII discrimination claim, and even if such a claim was cognizable, Plaintiff's working environment was not objectively intolerable.  Doc. 89 at 22.

Plaintiff does not cite to any law that recognizes a claim for constructive demotion and/or forced reassignment pursuant to the ADA and § 504 of the Rehabilitation Act, but the Court has found case law that discusses such a claim under Title VII.  "Although the Eleventh Circuit has not recognized 'constructive demotion' as an independent claim under Title VII, such claims have been considered under the general heading of Title VII discrimination claims in which the 'constructive demotion' has been analyzed as a potentially adverse employment action."  *Lamar v. State of Ala. Dep't of Conservation & Nat. Res.*, Case No. 1:14-cv-571-MHT-PWG, 2016 U.S. Dist. LEXIS 98158, at *33-34, 2016 WL 8814808, at *11 (M.D. Ala. July 26, 2016) (citing

*Crayton v. Ala. Dep't of Agric. & Indus.*, 589 F. Supp. 2d 1266, 1284-85 (M.D. Ala. 2008)).

Since the Eleventh Circuit has recognized other ADA-style claims under Title VII, the Court will also apply a Title VII analysis here.  Therefore, the Court must determine whether Plaintiff suffered an adverse employment action, and as the Court found, Plaintiff did not suffer an adverse employment action.  *Supra* section (IV)(B)(iii).  Further, Plaintiff did not overcome the legitimate non-discriminatory reasons that were proffered by Defendants.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's constructive-demotion-and/or-forced-reassignment claim (Count 5) is granted.

### viii.   Count 6 –unauthorized-medical-inquiry in violation of the ADA

In Count 6 of Plaintiff's Amended Complaint, he brings an unauthorized-medical-inquiry claim in violation of the ADA against the Board, and King and Washington in their official capacities.  Doc. 33. at 24-25.  Plaintiff claims he notified Defendants of his medical condition and provided them documentation of his condition, and despite that, Defendants made numerous inquiries with Plaintiff and Dr. Millette that were not job-related or consistent with business necessity.  *Id.* ¶¶ 160-69.

Defendants argue Plaintiff's unauthorized-medical-inquiry claim should be dismissed because any inquiry was job-related, consistent with business necessity, and based on the FMLA medical form that Plaintiff submitted.  Doc. 89 at 22-23.  Further, Defendants argue any additional medical inquiries to Dr. Millette were for him to complete a medical form.  *Id.*

The ADA states "[a] covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  However, "[a]

covered entity may make inquiries into the ability of an employee to perform job-related functions" if the information "is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record." § 12112(d)(3)(B), (4dr)(B); *see also* § 12112(d)(4)(C). Certain information may be disclosed to supervisors and managers "regarding necessary restrictions on the work or duties of the employees and necessary accommodations." § 12112(d)(3)(B)(i).

Plaintiff submitted his FMLA medical form for MAWSS to make proper accommodations for his disability, but his form was deficient after multiple resubmissions. *See* Doc. 97-30 at 2-3. Based on the deficiencies of the FMLA medical forms, the Court finds the requests for Dr. Millette to resubmit the forms were job-related and consistent with the business necessity to assess Plaintiff's disability based on a complete form.

Accordingly, the Court finds Plaintiff has failed to show the medical inquiries to Dr. Millette were not job-related or inconsistent with business necessity, and Defendants' motion for summary judgment as to Plaintiff's unauthorized-medical-inquiry claim in violation of the ADA (Count 6) is granted.

### ix.    Count 7 – violation of § 1983 First Amendment

In Count 7 of Plaintiff's Amended Complaint, he brings a claim for violation of his First Amendment rights against the Board, and King and Washington in their individual and official capacities. Doc. 33 at 25-26. Plaintiff claims Defendants discriminated and retaliated against him because he reported and opposed Defendants' discriminatory conduct and practices. *Id.* ¶¶ 170-78.[12]

---

[12] In Plaintiff's response to the motion for summary judgment, where he argues against qualified immunity for King and Washington, he seems to argue King and Washington are not entitled to qualified immunity because they were aware of the unlawfulness of their actions based on case

Defendants argue Plaintiff's claim for violation of his First Amendment rights should be dismissed because he spoke out about a matter that concerned only him, not a matter of public concern, and even if Plaintiff's speech was construed to be of public concern, Defendants did not play a role in his suspension. Doc. 89 at 23-26. Further, Defendants argue King and Washington are entitled to qualified immunity. *Id.*

> A public employee must prove the following elements by a preponderance of the evidence to maintain a claim of First Amendment retaliation:
>
>> (1) the employee's speech is on a matter of public concern; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees; and (3) the employee's speech played a "substantial part" in the employer's decision to demote or discharge the employee.
>
> *Battle v. Bd. of Regents*, 468 F.3d 755, 759-60 (11th Cir. 2006) (per curiam). "The first two elements are questions of law designed to determine whether the First Amendment protects the employee's speech." *Id.*

*Akins v. Fulton County*, 278 F. App'x 964, 970 (11th Cir. 2008) (hereinafter *Akins II*]) (per curiam).

> For speech to be protected as speech on a matter of public concern, "it must relate to a matter of political, social, or other concern to the community." *Watkins v. Bowden*, 105 F.3d 1344, 1353 (11th Cir. 1997). If the speech at issue is personal in nature, and "cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983). . . . It is well understood that "[a]n employee's speech will rarely be entirely private or entirely public." *Morgan v.*

---

law that establishes individual liability for retaliation in violation of the ADA. Doc. 97 at 33-34. However, Plaintiff did not bring a retaliation claim in violation of the ADA against King and Washington, individually, and the Court declines him a new opportunity to do so here. *See Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) (internal citations omitted) ("Rule 15(a) gives a district court "extensive discretion" to decide whether or not to allow a party to amend a complaint. This liberal discretion is not abused when the amendment would prejudice the defendant, follows undue delays, or is futile. Prejudice and undue delay are inherent in an amendment asserted after the close of discovery and after dispositive motions have been filed, briefed, and decided.").

> *Ford*, 6 F.3d 750, 755 (11th Cir. 1993).  We take into account the content, form, and context of the speech to glean its "main thrust."  *Id.* at 574 (citations omitted).  If the "main thrust" of a public employee's speech is on a matter of public concern, then the speech is protected.  *Id.* at 754-55.

*Akins v. Fulton County*, 420 F.3d 1293, 1303-04 (11th Cir. 2005); *but see also Garcetti v. Ceballos*, 547 U.S. 410, 423, 126 S. Ct. 1951, 1961, 164 L. Ed. 2d 689 (2006) ("When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences.  When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny.").[13]

Plaintiff claims he complained of discrimination from July through December 2016; on January 25, 2017, during his prediscovery hearing; and on September 20, 2017, when he claims his job responsibilities were restructured.  Doc. 97 at 17-19.  However, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment."  *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988) (quoting *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986), *cert. denied*, 479 U.S. 1064, 107 S. Ct. 948, 93 L. Ed. 2d 997 (1987)).  Plaintiff has not shown he related his concerns about disability discrimination to the public and "in no way dr[ew] the public at large or its concerns into the picture."  *Pearson v. Macon Bibb Cty. Hosp. Auth.*, 952 F.2d 1274, 1279 (11th Cir. 1992); *cf. Martinez v. City of Opa-Locka*, 971 F.2d 708, 710 (11th Cir. 1992) (per curiam) (providing

---

[13]      The Court's holding in *Garcetti* directly impacts the second element of a public employee's First Amendment retaliation claim.  So long as a public employee speaks during the course of performing her job duties, her First Amendment interests will always be outweighed by her employer's interest in prohibiting the speech, and her claim must fail as a matter of law.

*Akins II*, 278 F. App'x at 970.

testimony in regard to the public disposition of money); *Stough v. Gallagher*, 967 F.2d 1523, 1524,

1528 (11th Cir. 1992) (campaigning publicly for sheriff candidate); *Stewart v. Baldwin Cty. Bd. of

Educ.*, 908 F.2d 1499, 1506 (11th Cir. 1990) (expressing opposition to tax referendum at

Superintendent's meeting); *Williams v. Roberts*, 904 F.2d 634, 638 (11th Cir. 1990) (publishing

criticism of budget proposal). Therefore, Plaintiff's speech cannot be considered of public

concern, and his First-Amendment-retaliation claim fails.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's First-

Amendment-retaliation claim (Count 7) is granted.[14]

### ix.    Count 8 – failure to supervise and train violation of § 1983 Fourth Amendment

In Count 8 of Plaintiff's Amended Complaint, he brings a failure-to-supervise-and-train

claim pursuant to § 1983 and the Fourth Amendment against the Board, and King and Washington

in their individual and official capacities. Doc. 33 at 26-28. Plaintiff claims Defendants failed

and/or refused to provide adequate training and supervision to its agents, staff, and servants in the

---

[14] Therefore, the Court need not address in great detail Defendants' argument that King and Washington are entitled to qualified immunity since the claim fails as a matter of law. *See* Doc. 35 at 7-8. To be entitled to qualified immunity, the defendant must first establish that he was acting within the scope of his discretionary authority. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). It is clear both King and Washington were acting in the scope of their discretionary authority. Once that is shown, the burden shifts to the plaintiff to establish that qualified immunity is not appropriate. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (citing *Maddox*).

> To do that, the plaintiff must demonstrate (taking all the facts in the light most favorable to him) the following two things: (1) that the defendant violated his constitutional rights, and (2) that, at the time of the violation, those rights were "clearly established . . . in light of the specific context of the case, not as a broad general proposition[.]"

*Id.* (citation omitted). Plaintiff fails on both accounts here. Therefore, King and Washington are entitled to qualified immunity.

lawful execution of their duties and Defendants were aware of widespread abuse in regard to MAWSS's policies and procedures for discrimination and retaliation for protected activity.  Doc. 33 ¶¶ 179-91.

Defendants argue Plaintiff's failure-to-supervise-and-train claim pursuant to § 1983 and the Fourth Amendment should be dismissed because he failed to establish widespread violations that would put Defendants on notice of deficiencies in either training or supervision, and King and Washington are entitled to qualified immunity.  Doc. 89 at 26-28.

> Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691, 98 S. Ct. 2018; *see id.*, at 694, 98 S. Ct. 2018.  Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.  *See ibid.*; *Pembaur* [*v. City of Cincinnati*], 475 U.S. [469,] 480-81, 106 S. Ct. 1292[, 89 L. Ed. 2d 452 (1986)]; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  These are "action[s] for which the municipality is actually responsible." *Pembaur, supra,* at 479-80, 106 S. Ct. 1292.

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." [*City of*] *Canton* [*v. Harris*], 489 U.S. [378,] 388, 109 S. Ct. 1197[, 103 L. Ed. 2d 412 (1989)].  Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 389, 109 S. Ct. 1197.

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [*Bd. of the Cty. Comm'rs of*] *Bryan Cty.* [*v. Brown*], 520 U.S. [397,] , 117 S. Ct. 1382[, 137 L. Ed. 2d 626 (1997)].  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed

deliberately indifferent if the policymakers chose to retain that program. *Id.* at 407, 117 S. Ct. 1382. The city's "'policy of inaction'" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S. at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities . . . ." *Id.* at 392, 109 S. Ct. 1197; *see also Pembaur, supra*, at 483, 106 S. Ct. 1292 (opinion of Brenna, J.) ("[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials . . . .").

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S. at 409, 117 S. Ct. 1382. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger municipal liability." *Id.* at 407, 117 S. Ct. 1382. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick v. Thompson*, 563 U.S. 51, 60-63, 131 S. Ct. 1350, 1359-60, 179 L. Ed. 2d 417 (2011).

Plaintiff claims Washington did not follow up on verbal complaints of discrimination, and King and Washington merely performed a cursory review of EEOC policies at the hiring orientation. Doc. 97 at 16 n.16, 17 n.17, 34. However, Plaintiff's cited instances do not show Defendants were on notice of a deficiency in training or supervision from similar constitutional violations nor has Plaintiff shown a pattern of similar constitutional violations. Therefore, Plaintiff fails to demonstrate deliberate indifference as required.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's failure-to-supervise-and-train claim (Count 8) is granted.[15]

---

[15] As with the prior claim, *supra* note 14, the Court need not address in great detail Defendants' argument that King and Washington are entitled to qualified immunity since the claim fails as a matter of law. However, applying that same analysis here, the Court finds they would also be entitled to qualified immunity.

### ix.      Count 9 – negligent-supervision-and-training-state-law claims

In Count 9 of Plaintiff's Amended Complaint, he brings a state-law claim of negligent supervision and training against the Board.  Doc. 33 at 28-29.  Plaintiff claims the Board breached its duty to prevent retaliation and discrimination in the workplace by King and Washington.  *Id.* ¶¶ 192-98.

Defendants argue Plaintiff's state-law claim of negligent supervision and training should be dismissed because neither King nor Washington were negligent in the way that they handled Plaintiff's situation or their duties as HR officers, and even if it is assumed King and Washington were negligent, Plaintiff has not shown the Board was on notice of King's and Washington's negligence.  Doc. 89 at 29-30.

Under Alabama law, "[t]he elements of a negligence claim are a duty, a breach of that duty, causation, and damage." *Armstrong Bus. Servs. v. AmSouth Bank*, 817 So. 2d 665, 679 (Ala. 2001) (citing *AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141, 1144 (Ala. 1998)).

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him.  Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge.  It is incumbent on the party charging negligence to show it by proper evidence.  This may be done by showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in the exercise of due care, must have had them brought to his notice.  While such specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant to leave it to the jury whether they would have come to his knowledge, had he exercised ordinary care.

*Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1214-15 (Ala. 2008) (citations and internal quotation marks omitted).

Plaintiff seemingly fails to address his state-law claim of negligent supervision and training against the Board in his response to the motion for summary judgment and, therefore, he abandoned the claim. *See* Doc. 97. However, even from the facts presented, it does not appear the Board was on notice of improper behavior by either King or Washington. Therefore, Plaintiff fails to meet the elements of a negligence claim.

Accordingly, Defendants' motion for summary judgment as to Plaintiffs state-law claim of negligent supervision and training (Count 9) is granted.

### ix.     Count 10 – invasion-of-privacy state-law claim

In Count 10 of Plaintiff's Amended Complaint, he brings a state-law claim of invasion of privacy against the Board, and King and Washington in their individual and official capacities. Doc. 33 at 29-30. Plaintiff claims Defendants made unlawful inquiries about his medical history and made personnel decisions without objective medical evidence, which placed him in a false light as to his employment status. *Id.* ¶¶ 199-206.

Defendants argue Plaintiff's state-law claim of invasion of privacy should be dismissed because he cannot show either King or Washington communicated to anyone, other than Sumrall as the supervisor, the reason for Plaintiff's driving restrictions, and even if information was communicated, the information was not false. Doc. 89 at 30-32.

> Alabama has long recognized the tort of invasion of privacy. *Smith v. Doss*, 251 Ala. 250, 37 So. 2d 118 (1948). It is generally accepted that invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; or (4) appropriating some element of the plaintiff's personality for a commercial use.

*Ex parte Birmingham News, Inc.*, 778 So. 2d 814, 818 (Ala. 2000) (quoting *Johnston v. Fuller*, 706 So. 2d 700, 701 (Ala. 1997)).

Applying Restatement (Second) of Torts § 652E (1977) and the following comments, [the Alabama Supreme Court] has adopted the following definition for "false light" invasion of privacy:

> "'One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
>> "'(a)   the false light in which the other was placed would be highly offensive to a reasonable person, and
>> "'(b)   the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"

*Schifano v. Green Cty. Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993) (emphasis omitted) (quoting Restatement (Second) of Torts § 652E (1977)). A false-light claim does not require that the information made public be private; instead, the information made public must be *false*. *See* Restatement (Second) of Torts § 652E cmt. A. (1977).

Additionally, it is integral to a false-light claim that the untrue information be publicly communicated. Comment a. to § 652E states, "The rule stated here is, however, limited to the situation in which the plaintiff is given publicity. On what constitutes publicity and the publicity of application to a simple disclosure, see § 652D, Comment a., which is applicable to the rule stated here."

Comment a. to § 652D states:

> "'Publicity,' as it is used in this Section, differs from 'publication,' as that term is used in § 577 in connection with liability for defamation. 'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person. 'Publicity,' on the other hand, means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

> "Thus it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or

> statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in this Section. The distinction, in other words, is one between private and public communication."
>
> *See Rosen v. Montgomery Surgical Ctr.*, 825 So. 2d [735,] 739 [(Ala. 2001)]; *Johnston* [ ], 706 So. 2d at 703; *Ex parte Birmingham News, Inc.*, 778 So. 2d [at] 818 [ ].

*Butler v. Town of Argo*, 871 So. 2d 1, 12-13 (Ala. 2003).

Plaintiff does not cite to any Alabama law to support his claim that Defendants' medical inquiries are an invasion of his privacy, especially in light of the fact that he initiated true FMLA process, nor does he expound on the claim in his response to the motion for summary judgment. *See* Doc. 97. Plaintiff states, "[his] suspension, the degrading reassignment and removal of large engine duties, the inability to take standby and lost overtime, the directives to remain in the small-engine room, the isolation, and the very public insinuations regarding his health caused [him] embarrassment and humiliation" support his claim for "false light" invasion of privacy. *Id.* at 18. However, Plaintiff has not produced evidence, beyond his own conclusory assertions, that either King or Washington publicized any information about Plaintiff that would place him in a false light, nor has Plaintiff identified the information that placed him in a false light and leave the Court to conjecture.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's state-law claim of invasion of privacy (Count 10) is granted.

## V.   CONCLUSION

Based on the foregoing discussion and analysis, it is hereby **ORDERED**:

1.   Defendants' Motion to Strike Affidavit of Kyle Bosarge (Doc. 106) is **SUSTAINED** as to their objection to paragraph nineteen (19) insofar as Plaintiff states Sumrall said he would get the letter to HR, Plaintiff saw Sumrall place the letter in the inbox, and Sumrall

indicated to Plaintiff he delivered the envelope to HR.  Defendants' remaining objections to Plaintiff's affidavit are **OVERRULED**.

2.      Plaintiff's Motion to Strike Deposition Testimony of Dr. Terry Millette (Doc. 108) is **OVERRULED**.

3.      Defendants' Motion for Summary Judgment and Supporting Brief (Doc. 89) is **GRANTED** and Plaintiff's claims against Defendants are **dismissed with prejudice**.

A separate judgment that is consistent with this memorandum opinion and order will be entered pursuant to Fed. R. Civ. P. 58(a).

**DONE** and **ORDERED** this the 29th day of May 2020.

 s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE